16-11, Edmund Huffman McKinney, Regional Director of Region 15 of the National Labor Relations Board, which is Ozburn-Hessey Logistics LLC, argues that the issue in the next slide is with the BODZ for legal challenge. Good morning, Your Honors. Good morning. I'm Ben BODZ for Ozburn-Hessey Logistics. I'd like to reserve three minutes, if I could. Very well. I feel like an ALJ by the time we're done here. Your Honors, the central issue in this appeal is whether it was just and proper for the district court to issue a 10-J injunction under the National Labor Relations Act when there wasn't any record evidence that the underlying unfair labor practices caused disaffection among the employees towards the union. As the court knows, the board's burden in seeking an injunction is to show reasonable cause to believe that unfair labor practices occurred. Can you keep your voice up, counsel? Sure. The board's burden is to show two prongs, to show that reasonable cause exists to find an unfair labor practice occurred, and also that the issuance of a 10-J injunction is just and proper. In terms of the 10-J being just and proper, we submit, Your Honors, that the evidence that the board submitted in support of the injunction being just and proper could not have established what they were trying to show. And what they were trying to show is that employees were disaffected by unfair labor practices that the company committed, meaning they turned against the union. So if you look at what they actually submitted, they submitted six affidavits from five individuals, four employee union supporters, and one union organizer. And if you take those affidavits at face value, all that they show is that during the May and June timeframe in 2013, the employees had trouble signing up other employees to become union members, getting them to sign union cards. The affidavits also show that there was a reduction in attendance at union meetings beginning in May of 2013. Here's the problem with the board's evidence and with their argument. The unfair labor practices at issue in this case, the termination of Nate Jones and the reassignment of Jennifer Smith, happened after the alleged incidents where employees wouldn't sign the cards and when the employees stopped attending union meetings. So those unfair labor practices or alleged unfair labor practices could not have caused the disaffection that's contained in the affidavits submitted by the board. So on its face, what they're relying on to establish just and proper occurred before the alleged unfair labor practices and could not have caused it. So that's on its face one reason why the injunction could not have been just and proper. Also... And if you do this very thing again, you're going to get fired. And he goes off and does the same thing and leaves the forklift running. And he's so far away from it, he doesn't even know when somebody else comes and takes the keys. And he's surprised. And so then he gets fired for that. And yet the district court says that the firing was pretextual. Yeah. What's your view? What's going on here? Is it just a heaping measure of deference for the board or something? I believe so. I believe that's behind it. If you look at the district court's original decision, Nate Jones is mentioned in the statement of facts and in the relief granted. Not mentioned at all in the analysis. There was zero analysis whatsoever regarding Nate Jones' termination if you look closely at the district court's original order. And that really goes to the reasonable cause prong, Your Honor. And so that's a separate issue that I was going to get to is reasonable cause, but you're there already. And so is the only issue before us whether Jones and Smith should be reinstated to the positions they were at before the actions your company took, what, four years ago? Yes, Your Honor. That's it? Yeah, and they have been reinstated. Let's be clear. The company complied with the district court's injunction. Are there other people as to whom you already have complied? No, the company has complied with respect to Jones and Smith. So they've been reinstated? They have. There are some other folks involved that I guess have left the company or whatever, so they're not at issue here. Correct. And there were others who didn't accept the offer of reinstatement. So when the district court issued the 10-J injunction and said you have to offer these people reinstatement, there were some people that said no thanks and didn't come back. But just going back to the just and proper point for a minute, the evidence that the board submitted wasn't analyzed at all by the court in terms of whether it caused employee disaffection. And the reason that's important is because the whole point of a 10-J injunction is to preserve the board's remedial powers. If the point of a 10-J injunction... Meaning what here? Meaning to prevent the unfair labor practices from causing employee disaffection. Okay, so they're saying that you've been sort of cracking down on pro-union people. Right. And now you have a board proceeding going on in which, by the way, the ALJ apparently agreed with your position. So, I mean, this is a very odd situation. And so the remedial power here, they have to make sure that the employees don't get so disaffected while the board is looking at this that the whole thing becomes moot and they give up on organizing? That's the concept, Your Honor, yes. And, you know, first of all, we've got the causation issue that I've walked through on the timing. But if you get beyond that and you look at the fact that, okay, so there were people that wouldn't sign union cards and there were people that didn't attend union meetings. To say that that is because of an employee that was terminated in a different account, different building, and an employee that was reassigned to a different position in a different account, different building, is a real stretch. I mean, there are a number of reasons why someone would decline to sign a union card. And so the board's evidence or their theory doesn't take into account the fact that they're diminishing returns, right? Once you've signed up a certain number of people, there are less people to sign up. And so you're naturally going to have a reduction in the number of cards that you can get signed once. And actually, if you look at their affidavits, the affiants actually attribute different reasons to why employees wouldn't sign the union cards and why they stopped attending the meetings. So the Anita Wells affidavit talks about employees told her they wanted to see what the union would do for them before they signed a union card. Not, I didn't sign a union card because the company fired a different employee in a different building. I didn't sign a union card because I want to see what the union will do for me. That was in her affidavit. What's the current status as to the organizing activities and the union? Yeah, we're bargaining with the union right now. So ultimately there was a test of certification, meaning there were disputed ballots, and those got resolved by the D.C. Circuit in a way that was not favorable to the company. So the company recognized the union, and we're bargaining right now. Why doesn't that moot out the whole problem the board's trying to remedy in terms of maybe employees are going to be scared to join the union effort? Well, I think it undermines their rationale. I don't know that it moots it necessarily because we're still subject to the injunction. I mean, the board seeks an injunction to basically maintain the status quo while the board's looking at some of these allegations of bad labor practices. The status quo being a certain level of interest among the workers in having the union represent them, correct? Meanwhile, now the union is, in fact, representing them. So why do we need an injunction in order to maintain the ability of the workers to be represented? I don't think we do. I think the answer to your question is it's not necessary at this point. When the injunction was issued, this also raises another issue, which is the timing of all this in terms of what's going on. In terms of the procedural history, Your Honor, the injunction was issued two years roughly after the alleged unfair labor practices occurred. And so at that point, there is no status quo to restore. I mean, you're two years past when all of this happened. The effectiveness of an injunction two years later is really questionable to restore the status quo in the first place. And courts have looked at, and we cited cases in our brief, where courts have looked at delay of the board in seeking a 10-J injunction as a factor against granting the 10-J injunction. So we submit there was delay in this case anyway. And so at the time the injunction was issued, the status quo was unrestorable to the extent that they were trying to restore some type of status quo. Counsel, you're arguing actual causation. Is that the board's burden to establish that the anti-union activity actually caused a decrease in the union's organization activity, or is chilling activity that's anti-union that chills the organizational effort, is that sufficient? So, and I've thought about this question, I'm not arguing actual causation. That seems like what you're arguing. You're saying look at the facts that the union's efforts were going down before these activities occurred, so there's no actual causation. But I don't think that's the standard. If it is, you've got to cite me some law on that. I think it's unfair label practice if the employer chills, does activities that chills the abilities or the efforts to unionize. And I think that's what the argument is here, that the transfer of the one employee and the termination of the other one for their pro-union activities chilled the union's right to try to organize. So the argument is chill, but the evidence that was submitted in support of the argument that there was chill doesn't support the proposition at all and couldn't because of the timing, Your Honor. But to your question about causation, they have to submit some evidence that would let the court make a finding that there's chill. There's no evidence here. There's reasonable inferences. Are there not, that when you have pro-union employees that have adverse actions taken against them, that those adverse actions may have been taken because they're pro-union activities? Isn't that a reasonable inference? If there was evidence in the record to support it, which there's not. So just to answer your question, Your Honor, the only way that that is a reasonable inference is if there's some evidence of disaffection that gets submitted in support of just and proper. And the board submitted evidence in support of just and proper in this case, and the evidence they submitted doesn't support that inference in any way whatsoever. So is that a high standard or a low standard? Just and proper. I mean, it's not a... It's abusive discretion is the standard of review here. All right. Any further questions at this time? You'll have your rebuttal. I didn't write down. What is it? Three minutes. All right. Very well. Good morning. Good morning. May it please the court. I'm Laura Vasquez for the NLRB. Although we are discussing in this appeal the two provisions of the court's injunction order involving Smith and Jones, I would like to retreat the camera a little bit to show the big picture, because this case is really about a company that has been for years repeatedly, persistently trying to thwart its employees' organizing activities by engaging in the same kind of violations over and over again. And in this case, it was a... In May 2013 prompted a resurgence in union activity and union support, and that in turn caused the company to engage in a new round of violations to once again quash that renewed interest. And these violations included interfering with organizing activities, discharging several employees immediately after the board certification in May and June, and eventually the reassignment of Smith and the discharge of Jones. And these violations had a chilling effect that was established. The company is wrong when it says that there was no evidence of chill that postdated the early violations, because there is an affidavit from the union agent dated May 2014, right before the petition was filed in June, that covers the time span from the early violations in May and June up through the date of the affidavit, and that union agent testified about a decrease in attendance at union meetings, employees who had signed cards who then asked for their cards back, decrease in union signing. And the notion, Judge Griffin, that you were alluding to, that the chill has to be established, the company is simply wrong. That is contrary to this court's case law under 10J. This court has always recognized that certain violations have an inherent chilling impact, a tendency to affect employees' willingness to support the union, to stick their necks out and continue organizing activities. And in fact, the idea that there has to be specific evidence of causation demonstrating that certain specific violations caused the chilling impact was rejected by this court in Ahern v. Jackson Hospital. Okay, but we've got the Jones and the Smith matter before us. And as I said to your opposing counsel, I mean, Jones has a record of serious safety violations. He was specifically warned not to do this very thing of leaving a forklift running, which I can imagine is pretty unattended with nobody in it, which is a pretty dangerous thing. He was warned about that, correct? Well, the final warning that he had was for not wearing a seat belt, actually. Okay, throw that on, too. But he was warned about this forklift unattended business, correct? But this forklift unattended business. I need a yes or no. Yes, yes. And he signed a form that said if you do this again, you can be terminated, correct? Correct. But this kind of... Okay, I'll let you do the but. That's fair. Go ahead. That kind of violation happened repeatedly by other employees who were treated differently. So the question here really is... But then he goes on, I don't know how many, I don't know if the record shows how many times they got warned and if they signed forms, but he goes and does it again. And as I said before, I mean, he's talking to some pal of his for like 20 minutes, doesn't even know that somebody else sees this and comes and shuts down the forklift and takes the keys. And he gets terminated just as he was told he would get terminated. I mean, how is this something that... I mean, that just seems like an extremely justified firing. Meanwhile, the ALJ, your ALJ, totally agrees with him that this was, you know, they fired him for exactly the reason they said they fired him. What is missing from the picture is that Jones had recently been engaged in a confrontation with Phil Smith at a meeting over the company's reaction to the union campaign. So there had been two meetings in which he had had a face-off with Phil Smith. That makes him immune from getting fired for the very reason... It raises questions as to why Phil Smith treated him the way he was treated, which was differently from the way other employees were treated. I mean, the ALJ said that Jones' involvement with the union was minimal. Am I remembering that right from the record? The ALJ said that there was no evidence in the record that he had signed cards, but he had spoken out publicly about his concerns regarding the company's reaction to the union campaign. It seems like the rule we're being asked to adopt here basically is if somebody has a certain level of activity, they're untouchable here. Respectfully, Your Honor, I disagree. I think the rule is that if there's a level of union activity, in addition there's an established, well-established, adjudicated, severe anti-union animus by the company, and this supervisor in particular with whom he had the confrontation, and who was the one who singled him out for being treated this way, doing an investigation in which he wasn't interviewed, reporting him to upper-level management, to whom the other employees were never reported. Those are the best points that you can make. I agree. I mean, those are fair points. But then we step back, and this is an injunction, and again, it's a very odd thing, okay? I mean, there's all these sort of vague terms, remedial power and so on. Okay, so as we discussed earlier, what are we trying to remedy? Well, we're trying to preserve the status quo so that we don't allow any chill on union activities or organizing activities while the workers are figuring out whether they want to be represented. That's fine. But I guess I have two questions about that. I mean, number one, they are in fact represented now, and they're in collective bargaining. So why is it important to have this, you know, I think sort of dubious injunction as to two individuals in order to maintain interest in the union? Well, this union was newly certified. They're bargaining their first one, right? They've had a rough road to it, years, two elections, finally a certification that was also sort of going through the accident of the original certification not only being tested by the employer, but the original certification being cast into doubt by Noel Canning. So this is a delayed process. This union finally gets certified, and this is when it's the critical point for them to have the support of the bargaining unit. The need to prevent loss of support is actually just as great or perhaps even greater now that they're bargaining. This is the point in time when they have to have the support of the employees so that they have the option of threats of economic weapons, you know, lawfully, so that the employees are involved in the bargaining and the union knows what the issues are and how to effectively represent them. It's the critical moment, actually. But, you know, another thing is normally if a party waits one to two years after the relevant events to seek an injunction, seeking to preserve the status quo, that's a pretty big strike against the party. It's an indication that the injunction probably isn't as urgently necessary as they suggest, and that's what happened here. I mean, you guys don't seek an injunction at all for years after this, you know, putatively chilling firing of Mr. Jones. Why isn't that a strike? This is a series of violations occurring over several months. Fourteen charges filed by the union and individual charging parties over a period of several months. Some of them amended over time. The director had to investigate fully all these charges, give the company due process and an opportunity to respond. The final complaint in this case, after all these 14-plus charges were fully investigated, issued in April 2014, and the injunction petition was filed less than two months later in June. So that is not given the realities of the case. The violations spanning a period of time, the charges spanning a period of time, the number of allegations involved. There was no excessive delay and no dragging of the feet during the investigation. I mean, that is helpful. I don't see any reasoning at all in the district court's opinion as to Mr. Jones. I mean, they come in and say, hey, district court, the board's own ALJ just rejected across the board all of these allegations about Jones being fired for retaliatory reasons. ALJ said he just flat out, or she, whatever, whoever, flat out didn't believe this guy. I mean, not to mention Smith in the ALJ is not buying that at all either, the person who watched him testify. And the district court just says it's reviewed the decision and finds no reason to amend. I mean, what's... What the ALJ is to decide whether there are facts sufficient to support a non-frivolous theory. And there are here, and the district court made the critical findings to support 883 violations beginning in page 20 when the court says relying on the abundant evidence of union animus and the pattern of harassment, against employees, that there was sufficient evidence of animus here covering all the violations, the court says. I mean, it seems like probably what's going on here is a sense that the employer's behavior has been bad enough generally that, you know, basically there's a lockdown on any discipline for safety violations. I would posit that that's a valid consideration under... Mr. Jones was engaged in a safety violation, a technical violation of the rules. But he set the brake, he put it on neutral, nothing happened. He's been reinstated. The company has made no argument that he's such an awful employee that his reinstatement has had adverse consequences. It's been two years, he's been back, and there's been no issue. I don't know if that's in the record here. I mean, I don't see anything that addresses that. I didn't ask about it for that reason. Well, what we can extrapolate from the record is that he's been back, the company went back into district court to have the injunction modified and have him removed from the order and made arguments only relating to the AOJD without making any argument that his reinstatement was causing problems. I mean, I just wonder what our role is here. I mean, we have somebody, I mean, it's not a company-wide issue here. It's an issue about two individuals. And the Smith thing, you know, they reassigned her, and I mean, heck if I know if being a picker is tougher than being an auditor. Your Honor, but the district court did not have to know, nor do you have to know. No, I know. Well, whatever. I mean, that's one thing, but when you read the story of the Jones situation, and then you have the ALJ come in and say, basically, I don't believe a word this gentleman's telling me about his claim. And it's a safety issue. It's a serious safety issue. And it comes to us, and it's whether this injunctive relief, as to this guy, under these circumstances, on this record, is necessary to maintain the board's power. And, I mean, if we can't do something about this, I mean, it would seem that we have an ornamental role in this litigation. I mean, what more could you have in the record that would support the company's decision to remedy itself, to remedy this case? It's a safety problem. If I may, Your Honor, regarding Jones, the ALJ did not fully discredit his testimony at all. In fact, the ALJ found that he had engaged in protected activity, and there were no real factual disputes about the incident. He admitted that he did what he did. The person who decided to fire him wasn't in the building, I mean, didn't even know about any of his activity. Right. But the case law, the board case law, and the law of this circuit that we cite in our briefs, Sixth Circuit cases, recognize the principle that if the supervisor who initiates the action reports the person, sets it all in motion, has animus and knowledge, you have unlawful anti-union motivation that has control over the action. The person who contributed is a cause of the action, and that was the case here. Phil Smith had adjudicated animus, he had knowledge. I commend your cheerful and valiant effort here this morning, and you've given very helpful answers. Can I ask you one question? If we're here merely to handle the status quo, I think Judge Kethledge asked, why don't we have any authority over that? I mean, why is this case ever allowed to be here if we're just a rubber stamp for the district court? Oh, Your Honor, you are not just a rubber stamp. There's an abuse of discretion standard, and our position is that there is no abuse of discretion here. There is evidence of chill. There are violations that this court has recognized have an inherent chilling impact. There was harm shown that was already happening, and these two later violations, reasonable inference that they built up on it. There's a history of persistent recidivist violations by this company, and this injunction did its job. There have been no new charges referred to us for injunctive relief. There have been five board decisions, all court-enforced, and this is the second injunction. And it took five board decisions and two injunctions to stabilize the situation, to get the parties to the bargaining table, and allow employees to... If we have no right to overturn it with Jones or anybody else, what are we? You do have the right, it's an abuse of discretion standard, but based on the reasonable cost test, which is a deferential test, which requires only sufficient facts to support a non-frivolous theory, and our position is that both violations here meet that test. There are facts that can be interpreted different ways. I'm just going to edge in real quick. I mean, they're only seeking to displace a small part of these injunctions. They're not asking to get rid of all of them. They're just saying, wait a minute, I mean, come on, really, as to this one? And I mean, I don't see any evidence that the Jones termination has chilled anything, and I don't see much reason to think that there's going to be any effect at all. But I would just say that, with the rest of the injunct, both of them in place, and one person who sort of did exactly what he's told not to do, you know, has happened exactly what he was told would happen. Well, I would respectfully disagree, Your Honor. Mr. Court doesn't explain why. If these two provisions are removed from the injunction, we are essentially giving this company recidivist, persistent... We're giving them permission to turn around and take these two employees and make examples of them and create the chill that the injunction has been effectively preventing. Then they can turn around and say, you know what, Jennifer Smith, we're retaliating against you. Is what you want to show the other members of the union will protect your job even when employees endanger your safety? Well, it's not the injunction that has done that, respectfully, Your Honor. It's the company who has done that. But again, respectfully, Your Honor, the record is that the company has tolerated that very kind of rule infraction in other instances. So it's not the injunction that is creating that risk. It's the company. And the injunction does not preclude the company from lawfully enforcing its rules in a non-discriminatory manner so that if there is an infraction in the future without this whole evidence of animus against union supporters, then they can. They can enforce it. They can't do anything until, I don't know, you know, there's no animus whatsoever or something. Well, no, I do sincerely appreciate your answers this morning. Okay. Any further questions? Thank you, Counsel. Let me just address a couple specific points that came up in argument. And one was this concept of an inherently chilling impact. And I think it goes to the question you asked earlier, Judge Griffin. So if there is an inherently chilling impact of a discharge, then there would be no reason to have a just and proper analysis as part of the injunction. Because you're going to say just by the very nature of the allegation, that means that an injunction should be given whether or not it's just and proper. And so the reason that the board submitted affidavits of chill in this case was because they thought they needed evidence to establish chill. If they thought there was this inherently chilling impact, they wouldn't have filed affidavits in the first place. They would have relied on their inherently chilling impact. So that's one point I wanted to make. Another point is this concept of, Judge Kethledge brought this up, with respect to Nate Jones, the minimal union activity or protected concerted activity that he engaged in. And I believe Counsel referred to two face-offs with Phil Smith, who was the manager. If you look at what Nate Jones actually said in the meeting with Phil Smith, he made reference to the fact that he had previously worked at another company and they had just paid the employees a couple bucks more an hour and the whole union thing went away. And he was saying, why can't you do that for us? In fact, if you look at page 220 of the trial transcript, the phrase he used was, that would end it. So that was actually an anti-union message. It wasn't a pro-union message. So that face-off was not union activity. The other face-off with Phil Smith was where he gave a witness statement. There was a dispute between Phil Smith and another employee, and the company took a witness statement from him, and he said, I didn't hear what was said. That was his witness statement. So in what way that constitutes a face-off with Phil Smith that somehow infected this whole termination decision is not clear at all. Finally, the last point that I wanted to make is there's an attempt to pile on here. There have been findings against the company in the past. From the very beginning, this union has litigated every time there's disciplinary action for a union supporter. There have been findings against the company, but they are a small number of findings compared to the total overall number of unfair labor practice charges, allegations that have been filed by the union. So painting the company as this, I think recidivist was the word that was used. Let me ask you just a practical question. It hasn't got a darn thing to do with the law or how I'm going to decide, but as a practical matter, suppose we disagreed with you on Smith and agreed with you on Jones. The injunction would still be in effect, at least as to Smith. What have you really won? I mean, you've still got to go with the NLRB at some point. What is it you've really won? Your Honor, first of all, what we've won in that case is... As I said, it hasn't got anything to do with my decision. It hasn't got anything to do with just wondering where you're at at that point. With respect to Nate Jones, Your Honor, you're right. I mean, there's not a whole lot to win there. But with respect to Jennifer Smith, you know, she's been stuck doing things that are... But my hypothetic assumes we agree with her and disagree with Jones. What have you won? I mean, you all have come here, you know, and all this stir and drum boils down to these two individuals. But the board has sought an injunction previously against, but for this proceeding against OHL. They sought it in this proceeding. The union has currently pending unfair labor practices against the company. If we can't get some clarification of what standard the district court needs to apply in analyzing this, we could be standing back here again in a year or two. OK. All right. Thank you.